### PRESIDENT, DIRECTORS, &c. OF WALTHAM BANK *vs.* INHABITANTS OF WALTHAM.

A bank cannot legally be taxed for rail road stock pledged to it as collateral security for a debt.

ASSUMPSIT to recover $64·80, the amount of a tax assessed upon the plaintiffs and paid by them to the defendants. The case was submitted to the court upon the following statement agreed on by the parties:

On the 16th of April 1844, S. F. Belknap pledged to the plaintiffs 120 shares in the stock of the Fitchburg Rail Road Company, as collateral security for the payment of a promissory note, dated April 15th 1844, for the sum of $10,000 lent by the plaintiffs to him; and he, at the same time, delivered to the plaintiffs the following certificate: "No 439. For

120 shares of 100 dollars. The Fitchburg Rail Road Company. This is to certify that the president, directors and company of the Waltham Bank, as collateral security for S. F. Belknap's note, are entitled to one hundred and twenty shares in the capital stock of the Fitchburg Rail Road Company, subject to the provisions of the charter and by-laws of the company, and to such assessments as may be legally made thereon., Transferable by an assignment thereof on the books of the company, according to the orders established for such purpose. Witness the seal of the company and the signature of the president and treasurer, at Boston, this 16th day of April, A. D. 1844. Thos. Wiley, Treasurer.

(L. S.) Jacob Foster, President *pro tem.*"

This certificate entitled the plaintiffs to all the privileges of the owners of stock in said company; and the plaintiffs, prior to, on, and ever since the first day of May 1844, have held and had possession of said stock, for the purpose of collateral security as aforesaid, and for no other purpose. After the 1st of May 1844, the assessors of the town of Waltham assessed a tax of $64·80, upon said shares, to the plaintiffs, and regularly committed it to the collector of said town; and on the 25th of March 1845, the plaintiffs, upon demand of said collector, and under protest, paid said tax to said collector.

*E. R. Hoar*, for the plaintiffs.

*Mellen*, for the defendants.

WILDE, J. This case depends on the construction to be given to several sections of the Rev. Sts. *c. 7.* It is an action of assumpsit to recover back a sum of money which the plaintiffs have been compelled to pay in discharge of a tax, assessed upon them by the assessors of the defendant town, for sundry shares of the stock of the Fitchburg Rail Road Company. These shares had been pledged to them, before the assessment, as collateral security for the payment of a note of hand, by S. F. Belknap, for a loan of money to him by the plaintiffs. The question is, whether this tax was legally assessed upon the plaintiffs, or whether it ought to have been assessed on the said Belknap. It is a question of importance, and it is not free from difficulty. We think, however, after a careful consideration

of the statute, as it relates to the present case, that its meaning, although not very clearly expressed, may be ascertained with sufficient certainty.

The objection is, that although the plaintiffs had a special property in the said shares, as collateral security for the payment of their note against Belknap, he was nevertheless the owner, the general property still remaining in him. And so doubtless is the law as to pawns or pledges of goods, or personal property, in the common form. But the shares in question were pledged to the plaintiffs in the form of a mortgage, strictly speaking, as the legal title was transferred to them. We are then to consider the rights and titles, both legal and equitable, of a mortgagor and mortgagee in and to the mortgaged property. These are peculiar; but they have been long well established. They depend upon principles derived from the civil law. "The Roman hypotheca," says Coote in his treatise on the law of mortgage, p. 3, "closely corresponds with our idea of a mortgage. The subject in pledge was retained by the debtor, and the creditor was, in default of payment, driven to his *actio hypothecaria* to obtain possession; and at any time before sentence the debtor might redeem. By that law, the debt was the principal, the security an incident; and when the one ceased the other ceased also; and until sentence the ownership of the debtor was not displaced." So as to a mortgage by our law, although the legal estate in the property mortgaged is in the mortgagee, the mortgagor and those claiming under him are considered by courts of equity as the actual owners, until the foreclosure of the mortgage. And so in modern times they have been considered by courts of law. The doctrine is now well established, that the mortgagor is the actual owner against all the world except the mortgagee; and in some respects he is so considered, even against the mortgagee; for he is not accountable to the mortgagee for the rents and profits, while he remains in possession; and if the mortgagee takes possession, he is accountable to the mortgagor for the rents and profits, if the latter elects to redeem. So a mortgagor may maintain a writ of entry or

ejectment against a disseizor not claiming under the mort-gagee. And the same doctrine has been acted upon by the legislature, both in this country and in England. The estate of the mortgagor may be attached and taken in execution, and may be assigned, and will descend to his heirs, or, if personal estate, it will go to his executors or administrators, subject to the lien of the mortgagee. So by the Rev. Sts. c. 65, § 11, if the mortgagee of real estate should die, without having foreclosed the right of redemption, the mortgaged premises, and the debt secured thereby, shall be considered as personal assets in the hands of his executor or administrator. So in England, by 7 and 8 Wm. 3, c. 25, § 7, it is provided that the mortgagor in possession may vote for the return of members of parliament, notwithstanding the mortgage. So in the *King* v. *St. Michael's*, 2 Doug. 632, it was said that a mortgagor in possession might gain a settlement under the poor laws. "If," says Lord Mansfield, "the estate on which a pauper resides is substantially his property, that is sufficient, whatever forms of conveyance there may be ; and therefore a mortgagor in possession gains a settlement, because the mortgagee, notwithstanding the form, has but a chattel, and the mortgage is only a security. It is an affront to common sense," he adds, "to say the mortgagor is not the real owner." So by the law of England, and by our law, although the legal estate remains in the mortgagee of real estate, after the payment of the mortgage debt, nevertheless he cannot maintain an action of ejectment to recover possession against the mortgagor. In the case of *Martin* v. *Mowlin*, 2 Bur. 978, Lord Mansfield is reported to have said that "a mortgage is a charge upon the land ; and whatever would give the money will carry the estate in the land along with it, to every purpose. The estate in the land is the same thing as the money due upon it. It will be liable to debts; it will go to executors; it will pass by a will not made and executed with the solemnities required by the statute of frauds," &c. Judge Trowbridge was of opinion (8 Mass. 558) that these and some other remarks made in that case were probably accompanied with

some restrictions, which the reporter omitted to notice ; and we think, without some restrictions and qualifications, they do not truly describe the nature and quality of the estate of a mortgagee ; and so it was decided in *Parsons* v. *Welles,* 17 Mass. 419. The title of the mortgagee is not extinguished *ipso facto* by the payment of the mortgage debt; but it may be vacated by a bill in equity, and the mortgagor may be thereby restored to the possession of the mortgaged premises. Under such circumstances, it would indeed "be an affront to common sense to say the mortgagor is not the real owner."

From these authorities and principles, the conclusion seems obvious, that the mortgagor, and not the mortgagee, is to be regarded as the owner of the property mortgaged, for the purposes of taxation, unless it is otherwise provided by the Rev Sts. *c.* 7. The 11th section is the only provision that can possibly be so construed. The provision is, " when personal property is mortgaged or pledged, it shall, for the purposes of taxation, be deemed the property of the party who has the possession." It must be admitted that, considering this section in connexion with the 4th section, the meaning of it is not very clear.

The first question suggested is, whether this 11th section, although the language is general, was intended to apply to property mortgaged or pledged to banks. By the 4th section it is provided in general terms, and without any exception expressed, that " personal estate shall, for purposes of taxation, be construed to include," among other things, " all moneys at interest, due the persons to be taxed, more than they pay interest for, and all other debts due to them more than they are indebted for." Now we apprehend it never has been supposed, and certainly it cannot be maintained, that this provision was intended to apply to banks. By *c.* 9, § 1, every bank is bound to pay semi-annually to the treasurer of the Commonwealth a tax of one half of one per cent. on the amount of its capital stock, actually paid in. It must be inferred that it was not intended that banks should be liable to any additional tax for the privilege of lending their moneys. And it

would seem reasonably to follow, that if they are not liable to be taxed for moneys at interest, and debts due to them, they would not be liable to be taxed for property mortgaged or pledged merely for security; the debt being the principal, and the security the incident or accessory. If this is a true construction of the fourth section, it would seem to follow that the eleventh section was not intended to apply to property mortgaged or pledged to banks, although, by a literal construction, both sections would extend to banks as well as other corporations or persons. For both sections are to be so construed as consistently to stand together; and if by the fourth section, taken in connexion with the first section of the ninth chapter, the plaintiff would not be liable to be taxed for property pledged or mortgaged to them as collateral security, the same construction should be given to the eleventh section. We have not, however, found it necessary to decide this question, in the present case; for we are of opinion, that the eleventh section does not apply to the mortgages or pledges of public or other stocks.

Speaking of public stock, Sir William Grant, in *Wildman* v. *Wildman*, 9 Ves. 177, says, " the interest in stock is properly nothing but a right to receive a perpetual annuity, subject to redemption ; a mere right therefore ; the circumstance that the government is the debtor makes no difference ; a mere demand of the dividends as they become due; having no resemblance to a chattel moveable, or coined money, capable of possession and manual apprehension." So in *Kirby* v. *Potter*, 4 Ves. 751, the master of the rolls (Sir Richard Pepper Arden) says, " there is a very untechnical expression used with regard to stock. There is literally no such thing as £100 stock. The 3 per cents are only perpetual annuities, granted forever, redeemable by the public upon the payment of a certain sum of money." Now we think the language of the eleventh section does not refer to any such property or securities ; it refers, evidently, to property that is tangible, moveable, and capable of possession by either party, which stock mortgaged is not. The title cannot be in the mort-

gagee, and the possession in the mortgagor. A similar provision is contained in the seventh section, in respect to real estate. That provides, that " in cases of mortgaged real estate, the mortgagor shall, for the purposes of taxation, be deemed the owner, until the mortgagee shall take possession ; after which the mortgagee shall be deemed the owner." This provision would not relate to the grant of an incorporeal hereditament by way of mortgage, because no possession can be given of such property, and it cannot pass from one to another without deed. Bac. Ab. Grants, E. The existence of such incorporeal rights, it is said, " is merely in idea and abstracted contemplation ; though their effects and profits may be frequently objects of our bodily senses." 2 Bl. Com. 20. That the framer of this section, or the legislature, had in contemplation mortgages of property of this description, is in a high degree improbable ; and from the language of the eleventh section, the same inference may be drawn in respect to mortgages of stock. The language of both sections is descriptive of corporeal, visible, and tangible property, of which either party may take open possession ; and not of incorporeal hereditaments or rights, which are incapable of such possession. We are therefore of opinion, upon the whole matter, that this case is not within the eleventh section of the statute, but depends on the general question, namely, whether the mortgagor or mortgagee, before foreclosure of the mortgage, is to be considered as the owner of the mortgaged property ; and if so, then we can have no doubt that the mortgagor, and not the mortgagee, is to be so considered. This opinion seems to us fully sustained by the principles and authorities already referred to, and is confirmed by *St.* 1838, *c.* 98, § 3. This statute, it is true, does not relate to the subject of taxation ; but it provides, that where stock in any corporation is transferred as collateral security, the pledgor alone shall be responsible as a stockholder in said corporation ; thus recognizing the general principle, that the pledgor or mortgagor is to be considered as the owner of the property pledged or mortgaged.

*Judgment for the plaintiffs.*